THE BINSKY CORPORATION, d/b/a )
ADVANTAGE FOOD & BEVERAGE, )
                           )
         Plaintiff, )
                           )
         v. )           1:25cv1043
                           )
USCONNECT LLC )
and GLOBALCONNECT LLC, )
                           )
         Defendants. )

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the undersigned United States Magistrate Judge on Defendants' Partial Motion to Dismiss (Docket Entry 11) (the "Motion"). For the reasons that follow, the Court should grant the Motion.

### BACKGROUND

### I. The Agreement & Plaintiff's Notice of Sale

Plaintiff Advantage Food & Beverage ("Plaintiff"), an Ohio-based vending company (see Docket Entry 1 (the "Complaint"), ¶¶ 1, 9) seeks recovery from Defendants USConnect and GlobalConnect (collectively, "Defendants"),[1] limited liability companies based in North Carolina (see id. ¶¶ 3-4), following the termination of the

---

1 According to the Complaint, "GlobalConnect . . . is an attempt at rebranding USConnect" (Docket Entry 1, ¶ 10). The entities "operate[] the same type of business" (id.), employ the same chief executive (see id. ¶ 5), and "are [allegedly] jointly and severally liable to [Plaintiff] for their actions" (id. ¶ 12).

parties' contractual relationship in July 2024 (see id. ¶ 16). That contractual relationship allegedly began in 2021 when Plaintiff and Defendants "entered into a [five-year l]icense [a]greement" (id. ¶ 13; see also Docket Entry 12-1 at 2-4) (the "Agreement") which "established a framework for [Plaintiff's] use of [Defendants'] services, technology, and branding in its vending operations" (Docket Entry 1, ¶ 13; see also id. ¶ 8 (alleging examples of Defendants' services, such as "cashless payment [ ],"  "inventory tracking," "advertising," and "data analytics")).

According to the Complaint:

> The [ ] Agreement does not have a provision that specifically addresses the rights of the parties to assign the [A]greement to a third party.  There is no provision that prohibits [Plaintiff] from assigning the [ ] Agreement to a third party or that third party from assuming the [A]greement.

> Section 9 of the [ ] Agreement provides as a ground for [Defendants] to terminate the [ ] Agreement:

> > 9.   Termination

> > 9.1 Event of Default.  The occurrence of any one or more of the following events shall constitute an event of default by Operator under this Agreement (each, an "Event of Default"):

> > . . .

> > (vi)  Operator sells or agrees to sell all or substantially all of its business assets to any other party without the prior written consent of [Defendants] (which consent may be withheld, conditioned, or delayed in the sole discretion of [Defendants]);

> > . . .

2

9.2 [Defendants'] Rights to Terminate this Agreement. Upon the occurrence of any one or more Events of Default, subject to notice and opportunity to cure (if any), [Defendants] may in [their] sole discretion terminate this Agreement immediately upon notice to Operator.

(Id. ¶¶ 14-15 (emphasis omitted) (ellipses in original).)

The Complaint alleges that, "[o]n or about July 1, 2024, [Plaintiff] informed [Defendants] that [it] intended to sell the majority of its assets to a third party, Continental Café, LLC [ ] ('Continental')." (Id. ¶ 16.) "[Plaintiff also allegedly] informed [Defendants] that it anticipated closing in 30 days, around July 31, 2024" (id. ¶ 17) and wrote:

"Please let us know how we can help make this transition smooth for you, Continental, and, most of all, our mutual customers." In doing so, [Plaintiff] afforded [Defendants] the opportunity to allow Continental to assume [Plaintiff's obligations under the] Agreement, or enter into a new license agreement with Continental.

(Id.)

## II. Post-Notice Communication Between the Parties

"Rather than working to transfer the [ ] Agreement to Continental[, Defendants allegedly] chose to proceed to collect from Plaintiff certain termination/offboarding fees." (Id. ¶ 26.)

As the Complaint alleges:

On July 2, 2024, [Defendants'] Senior VP of Operations . . . wrote to [Plaintiff]: "I would like to have a call with you to explain our standard offboarding process. It includes dispositioning the card balances

3

and all existing liabilities during the 30 day period.
The offboarding team has been informed and has started
this process."

(Id. ¶ 18.)

Next, the Complaint alleges that, "[o]n July 9, 2024,
[Defendants' controller] sent [Plaintiff four] invoices . . . for
a total sum of $430,405.36." (Id. ¶ 29.) Two days later, "[o]n
July 11, 2024" (id. ¶ 37), Defendants' chief executive allegedly
wrote to Plaintiff:

"I will make sure that no auto-reloads are discontinued
on any of the user accounts until July 31st as I do not
wish to disrupt the users or clients or worry you guys.
As far as I'm concerned you all are members in good
standing until the time of the sale of your company and
thus, no changes will be made to any of your user
accounts[,] and those will be handled consistent with how
they have been handled in the past. . . . That said,
[one of Defendants' employees] is in discussions with the
company purchasing you guys to see if there is a path
forward for us working with them, but that is still
undetermined at this time."

(Id.)

"Meanwhile, on July 16, 2024, [Defendants' controller
allegedly] acknowledged" (id. ¶ 28) that:

"[a]t this point the offboarding process is proceeding as
normal with the assumption that no one will assume the
contract. Should this change, we will make the necessary
adjustments."

. . .

After further correspondence between [the controller] and
[Plaintiff], [the controller] sent [Plaintiff] an email
on July 19, 2024, demanding that [Plaintiff] send an
overnight payment of $327,316.69 to [Defendants], which
was based upon the July 9th invoices, [five] additional

4

invoices, and a credit in favor of [Plaintiff] for
deposits collected by [Defendants].

(Id. ¶¶ 28-30 (emphasis omitted); see also id. ¶ 31 (allegedly "provid[ing] a breakdown of [invoices and credits totaling] $327,316.69").)

### III.  Plaintiff's Payment

"On July 19, 2024, [Plaintiff allegedly] paid [Defendants] $327,316.69, not because it agreed that all the charges were proper, but rather to ensure that essential services supporting customer account continuity were not disrupted by [Defendants]. [Plaintiff allegedly] also wanted to avoid late charges/interest that [Defendants] threatened."  (Id. ¶ 32.)

As alleged the in the Complaint:

Of th[e c]ollected [a]mount, [Plaintiff] disputes that it owes [Defendants] a total amount of $139,533.90 for [two] invoices [of] $17,500.00 and [ ] $122,033.90, which collectively represent unwarranted termination fees ([the] "Termination Fees").

At the time of [the] termination of the [ ] Agreement, the remaining term . . . was 22 months.

Plaintiff is informed and believes . . . that [Defendants] ha[ve], since the date of the termination of [the] Agreement, taken the same hardware and software devices that [Plaintiff] was using and assigned those to Continental at the same rates for [ ] 24 months.

In other words, [Defendants] ha[ve] essentially assigned the [ ] Agreement from [Plaintiff] to Continental.

(Id. ¶¶ 33-36 (some parentheses omitted); see also id. ¶¶ 20 (alleging that, "[u]pon the sale of [Plaintiff's] business to Continental, [Plaintiff] transferred to Continental . . . all [ ]

5

equipment and machines utilized in connection with [Plaintiff's] business"), 27 (alleging that "[o]nly after [Defendants] collected and/or withheld the [ T]ermination[ F]ees from [Plaintiff] did [Defendants] then enter into a contract with Continental"), 42 (alleging that "[o]nly after charging and/or withholding funds from [Plaintiff] for [the] Termination Fees[] did [Defendants] enter into an agreement with Continental").)

"Despite [Defendants'] prior representations that [they] would 'make the necessary adjustments' to the 'offboarding process' with respect to the [ ] Termination [F]ees should the [ ] Agreement be assumed by Continental" (id. ¶ 38), the Complaint alleges that "no adjustments/refunds were made to [Plaintiff] after [Defendants] secured the contract with Continental for all the payments [Plaintiff] would have made . . . through the end of the term of th[e Agreement]" (id.). Defendants allegedly "could have (and in fact did ultimately) avoid all of the disputed damages ([the] Termination Fees) that [they] collected from [Plaintiff]." (Id. ¶ 41; see also id. (alleging that Defendants "did not mitigate [their] damages by entering into an agreement with Continental").)[2]

_____

2   The Complaint also alleges "facts as to Amazon shrinkage monies owed to [Plaintiff]" (Docket Entry 1 at 10 (emphasis and all-caps font omitted); see also id. ¶¶ 44-57 (alleging that Defendants "owe[ Plaintiff] at least $209,276.58 [in] Amazon [s]hrinkage [payments]")). "[Although] Defendants dispute that it [sic] owes any amount to [Plaintiff] as it relates to . . . [those] shrink[age payments], [the] Motion [ ] does not address [Plaintiff's] claims related to the Amazon shrink[age]." (Docket Entry 12 (the "Supporting Brief") at 7 n.7.)

6

## IV. Relevant Causes of Action and Procedural History

As relevant to the Motion, the Complaint pursues four causes of action related to the Termination Fees: "[m]oney [h]ad and [r]eceived" (id. at 17 (emphasis omitted)) ("Count Four"), "breach[ of] the [ ] Agreement" (id. ¶ 86) ("Count Five"), "breach of the implied covenant of good faith and fair dealing" (id. ¶ 94) ("Count Six"), and "[v]iolation[s] of the North Carolina Unfair and Deceptive Trade Practices Act [('UDTPA')], N.C. Gen. Stat. § 75-1.1 et seq." (id. at 19 (emphasis omitted)) ("Count Seven"). According to the Complaint, Counts Four through Six seek to recover the "Termination Fees" (id. at 17 (emphasis omitted); accord id. at 18, 19; see also id. ¶¶ 86 (alleging "breach of the [ ] Agreement by charging [Plaintiff] and/or withholding funds" as to Count Five), 92 (alleging breach of good faith and fair dealing "by charging [ ] and/or withholding funds" as to Count Six)), while Count Seven seeks redress related to the "Termination Fees" and "Amazon [s]hrinkage" (id. at 19 (emphasis omitted)).

Pursuant to Federal Rule of Civil Procedure (the "Rules") 12(b)(6), Defendants moved for partial dismissal as to the "four [ ] causes of action related to the Termination Fees" (Docket Entry 11, ¶ 6). Plaintiff responded in opposition (see Docket Entry 16 (the "Response")), and Defendants replied in further support of the Motion (see Docket Entry 18 (the "Reply")).

7

## I.  Rule 12(b)(6) Standards

A complaint fails to state a claim when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Although the "court must accept as true all of the allegations contained in a complaint," that tenet "is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" cannot "survive a Rule 12(b)(6) motion."  Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

"In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety . . . ."  E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011).  The Court may also consider a document "attache[d ] to [the] motion to dismiss," so long as "it was integral to and explicitly relied on in the complaint and [ ] the plaintiff[] do[es] not challenge its authenticity."  Brown Goldstein Levy LLP v. Federal Ins. Co., 68 F.4th 169, 174 (4th Cir.

8

2023) (internal quotation marks omitted); see also Parker v. Henry & William Evans Home for Child., Inc., 762 F. App'x 147, 153 (4th Cir. 2019) ("The rationale underlying this exception is that concerns about lack of notice to the plaintiff when the court looks to documents outside the complaint are dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint." (internal quotation marks and alterations omitted)).

Here, in seeking partial dismissal of the Complaint, Defendants submitted, inter alia, a "copy of Section[s] 9.1 through 9.3 of the [ ] Agreement" (Docket Entry 12 at 4 n.5; see also Docket Entry 12-1 at 2-4). The Court may consider that submission, as the Complaint relies on the Agreement (see, e.g., Docket Entry 1, ¶¶ 14-15 (describing and quoting extensively from the Agreement)), its terms qualify as clearly integral to Plaintiff's claims, including for breach of contract (see id. ¶¶ 83-87), and Plaintiff's Response does not contest its validity (see Docket Entry 16 at 1-21).

## II. Analysis

### A. Voluntary Payment Doctrine

The Motion seeks dismissal of "four causes of action [which] attempt to recover the Termination Fees" (Docket Entry 12 at 10) on the grounds that North Carolina's "voluntary payment doctrine bars [such recovery]" (id.). Opposing dismissal, Plaintiff contends

9

that the circumstances of its payment implicate "exceptions to the voluntary payment doctrine, including payments made under misapprehension of the true facts [or], in the alternative, withheld deposits that cannot be classified as voluntar[ily paid]" (Docket Entry 16 at 5). Because the Complaint belies Plaintiff's contentions, Defendants' position should prevail.

"North Carolina's voluntary payment doctrine stands for the simple principle that 'the voluntary payment of money by a person who has full knowledge of all the facts can not [sic] be recovered.'" Johnson v. Sprint Sols., Inc., 357 F. App'x 561, 562 n.1 (4th Cir. 2009) (brackets in original) (quoting Guerry v. American Tr. Co., 234 N.C. 644, 647, 68 S.E.2d 272, 274 (1951)). Although "payments are not considered voluntary . . . when [ ] made under misapprehension of the true facts," Johnson v. Hooks, 21 N.C. App. 585, 590, 205 S.E.2d 796, 799-800 (1974), "there can be no recovery" for "a payment [ ] made in ignorance or mistake of fact where the means of knowledge or information is in reach of the paying party [who nonetheless] neglects to obtain it," Johnson v. Sprint Sols., Inc., No. 3:08cv54, 2008 WL 2949253, at *2 (W.D.N.C. July 29, 2008) (citing Brummit v. McGuire, 107 N.C. 351, 356, 12 S.E. 191, 193 (1890)). Likewise, "a payment voluntarily made, with a full knowledge of all the facts, though reluctantly done, and under protest, cannot be recovered back." Brummit, 107 N.C. at 357, 12 S.E. at 193 (citing Devereux v. Insurance Co., 98 N.C. 6,

8, 3 S.E. 639, 640 (1887)).  In light of Defendants' "use of the voluntary payment doctrine . . . as an affirmative defense, [the M]otion under Rule 12(b)(6) should be granted [only] if [the] affirmative defense . . . is apparent from the face of the [C]omplaint." Sprint, 2008 WL 2949253, at *2 (internal quotation marks and ellipses omitted).

Here, the Complaint alleges that, "[o]n July 9, 2024, [Defendants] sent [Plaintiff four] invoices" (Docket Entry 1, ¶ 29).  Two of those invoices for "$17,500.00" and "$122,033.90 [ ] collectively represent[ed the T]ermination [F]ees" (id. ¶ 33 (parentheses omitted)).  Even before sending those invoices, Defendants informed Plaintiff of their intent to "'disposition[] the card balances and all existing liabilities'" (id. ¶ 18).  Then, with the invoices in Plaintiff's possession and three days before Plaintiff paid the Termination Fees (see id. ¶¶ 28, 30), Defendants told Plaintiff that "'the offboarding process is proceeding as normal with the assumption that no one will assume the [Agreement]'" (id. ¶ 28 (emphasis omitted); see also id. (alleging that Defendants stated they would "'make the necessary adjustments'" if another party assumed the Agreement (emphasis omitted))). "[O]n July 19, 2024, [Defendants] demand[ed] . . . overnight payment of $327,316.69[, a figure] based upon the July 9th invoices, [five] additional invoices, and a credit in favor of [Plaintiff] for deposits collected by [Defendants]."  (Id. ¶ 30.)

11

That same day, and ten days after Plaintiff received invoices for the Termination Fees (see id. ¶ 29), "[Plaintiff] paid [Defendants] $327,316.69 [despite] it[s dis]agree[ment] that all the charges were proper" (id. ¶ 32). That payment included "$139,533.90 for . . . [the] Termination Fees" (id. ¶ 33 (parentheses and quotation marks omitted)).

Those allegations demonstrate that Plaintiff knew of Defendants' intent to terminate the Agreement, received invoices which included the Termination Fees, and, despite its disagreement with the charges (see id. ¶ 32), paid the Termination Fees in full. Accordingly, Plaintiff's voluntary payment of the Termination Fees with "full knowledge of all the facts," Guerry, 234 N.C. at 647, 68 S.E.2d at 274, "is apparent from the face of the [C]omplaint," Sprint, 2008 WL 2949253, at *2 (internal quotation marks omitted), and therefore bars Plaintiff from recovering the Termination Fees. See also Sprint, 2008 WL 2949253, at *3 (noting that a plaintiff's "pay[ment of] invoices despite the knowledge that she was being charged for [items] that she did not think were correct . . . subject[ed] her[] to the voluntary payment doctrine").

Seeking an exception to the voluntary payment doctrine, Plaintiff offers a number reasons as to why it involuntarily paid the Termination Fees "under misapprehension of the true facts" (Docket Entry 16 at 5), all of which prove unavailing. First, Plaintiff contends that "[it] was unaware of [ ] ongoing

12

interactions and negotiations between Defendants and Continental at the time of payment" (id. at 7).  Yet, as alleged in Complaint, Defendants' chief executive "wrote to Plaintiff" (Docket Entry 1, ¶ 37) eight days before Plaintiff paid the Termination Fees (see id. ¶¶ 32, 37) stating that his colleague "'[wa]s in discussions with the company purchasing [Plaintiff, i.e., Continental,] to see if there is a path forward for [Defendants'] working with them'" (id. ¶ 37).  Plaintiff therefore knew of "ongoing interactions [ ] between Defendants and Continental" (Docket Entry 16 at 7) before paying the Termination Fees.  Similarly, the Complaint fails to allege the existence of any "negotiations" (id.) between Defendants and Continental (see, e.g., Docket Entry 1, ¶ 27 (alleging that "[o]nly after [Defendants] collected" payment from Plaintiff "did [they] . . . contract with Continental" (emphasis added))), let alone that such negotiations occurred without Plaintiff's knowledge before it paid the Termination Fees.  That absence of pre-payment interactions unknown to Plaintiff also renders implausible any "infer[ence] that Defendants . . . withheld material information from [Plaintiff] regarding [their] interactions [with Continental]" (Docket Entry 16 at 8).

Next, Plaintiff contends that the Complaint presents "a legitimate dispute about whether Continental assumed the [ ] Agreement from [Plaintiff] (with Defendants' blessing)," in which case, according to Plaintiff, "no Termination Fees would have been

13

due to Defendants because the [Agreement] would have remained in effect and [would] not have been terminated." (Id. at 6.) The Complaint, however, lacks any indication that an assumption occurred; instead, it alleges that Plaintiff "afforded [Defendants] the opportunity to allow Continental to assume [the] Agreement, or to enter into a new [ ] agreement with Continental" (Docket Entry 1, ¶ 17). Per the Complaint, Defendants chose the latter, "'proceeding [ on] the assumption that no one will assume the [Agreement]'" (id. ¶ 28 (emphasis omitted)) and later "enter[ing] into an agreement with Continental" (id. ¶ 42). On those facts, no assumption occurred, notwithstanding conclusory allegations to the contrary (see, e.g., id. ¶¶ 36 (alleging that Defendants "essentially assigned the [ ] Agreement from [Plaintiff] to Continental"), 98h. (alleging that Defendants "treat[ed] the transaction as . . . an assignment")).[3]

As to Plaintiff's contention that "[t]he voluntary payment doctrine [ ] does not apply to those portions of the Termination Fee[s] that are based upon Defendants' unilateral[] withholding of

_____

    3  Plaintiff provides no authority for the proposition that, following the collection of one buyer's termination fees, another buyer's agreement involving "the same hardware, services, and fees" (Docket Entry 16 at 4) "actually [constitutes an] assum[ption]" of the first buyer's agreement (id.). (See id.) And North Carolina law appears to the contrary. See, e.g., Commercial Nat'l Bank of Charlotte v. Charlotte Supply Co., 226 N.C. 416, 426, 38 S.E.2d 503, 509 (1946) (noting that, even between the same parties, "[t]he making of a second contract dealing with the subject matter of an earlier one does not necessarily abrogate the former contract").

14

sums" (Docket Entry 16 at 8; <u>see also</u> <u>id.</u> at 9 ("[T]he [w]ithheld [a]mount of \$118,597.67 cannot be considered a voluntary payment")), the Complaint does not include any withheld sums in its definition of the Termination Fees; rather, it alleges that "a total amount of \$139,544.90 for invoices [of] \$17,500.00 and [ ] \$122,033.90[ ] collectively represent[s the] [T]ermination [F]ees" (Docket Entry 1, ¶ 33 (parentheses omitted)), and that Plaintiff affirmatively "paid" (<u>id.</u> ¶ 32) that amount (and more) to Defendants (<u>see</u> <u>id.</u>). The voluntary payment doctrine therefore bars Plaintiff's recovery of the Termination Fees without implicating any withheld sums. In turn, the Motion's pursuit of dismissal for reasons beyond the voluntary payment doctrine (<u>see, e.g.,</u> Docket Entry 12 at 12-13 (contending that Counts Four through Seven errantly rest on a failure-to-mitigate theory)) encompasses each of Plaintiff's claims, including those related to withheld sums (<u>see</u> Docket Entry 1, ¶¶ 86, 92 (asserting claims for breach of contract and breach of the duty of good faith and fair dealing based, in part, on Defendants' alleged "withholding [of] funds from [Plaintiff]")).[4]

---

[4] As noted above, the Complaint fails to plausibly allege that Continental assumed Plaintiff's obligations under the Agreement. As such, the Court need not consider Plaintiff's contention that the voluntary payment doctrine should not apply because "Defendants represented that 'necessary adjustments' would be made if the [ ] Agreement should be assumed" (Docket Entry 16 at 6-7). Similarly, the Court need not address the effect of an assumption on Defendants' termination rights, or accept Plaintiff's

(continued...)

**B. UDTPA**

The Motion also contends that Plaintiff's UDTPA claim "does not allege [ ] substantial aggravating circumstances" (Docket Entry 12 at 16 (quotation marks omitted)) and therefore warrants dismissal "as it relates to the Termination Fees" (id. at 17; see also Docket Entry 1, ¶ 98d. (alleging that Defendants "engaged in unfair trade practices by collecting [the] Termination Fees from [Plaintiff] while simultaneously entering into a contract with Continental")).[5]

---

4(...continued) conclusion that, in the event of an assumption, "no Termination Fees would have been due" (id. at 6). In any event, such an inquiry would not impact the Court's analysis of the voluntary payment doctrine or its resolution of the Motion, as (A) the Agreement does not address the parties' assignment rights (see Docket Entry 1, ¶ 14), and (B) Plaintiff appears to misunderstand the nature of assignment and assumption of contractual obligations, alleging on the one hand that Defendants prevented Plaintiff from assigning Plaintiff's own obligations to a third party (see id. ¶ 17 (alleging that Defendant could have "allow[ed] Continental to assume [the ] Agreement")), and on the other that Defendants unilaterally assigned Plaintiff's contractual obligations to Continental (see, e.g., id. ¶ 36 (alleging that Defendants "essentially assigned the [ ] Agreement from [Plaintiff] to Continental")). See generally 6 Am. Jur. 2d Assignments § 18 (2d ed. May 2026) (noting that, "absen[t ] an express provision," a contract "is assignable without the consent of the other party").

5 The Motion seeks only partial dismissal of Plaintiff's UDTPA claim, specifically the portions of that claim concerning the Termination Fees. (See Docket Entry 11, ¶ 6; accord Docket Entry 12 at 7 n.7.) "Rule 12(b)(6) . . . permits the [C]ourt, upon motion of the defendant, to dismiss all or part of a plaintiff's cause of action for failure to state a claim upon which relief can be granted." Frye v. City of Kannapolis, 109 F. Supp. 2d 436, 438 (M.D.N.C. 1999). Here, although the Complaint limits its claims for money had and received, breach of contract, and bad faith to

(continued...)

16

Case 1:25-cv-01043-WO-LPA    Document 20    Filed 07/31/26    Page 16 of 28

"To recover under the UDTPA, a [plaintiff] must show that (1) the defendant engaged in conduct that was in or affecting commerce, (2) the conduct was unfair or had the capacity or tendency to deceive, and (3) the plaintiff suffered actual injury as a proximate result . . . ." Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 164 (4th Cir. 2012) (internal quotation marks omitted). As to that second element, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain a[ UDTPA] action," Branch Banking & Tr. Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). Rather, "a plaintiff must show substantial aggravating circumstances attending the breach," id. (quotation marks omitted), such as "unfairness or 'deception either in the formation of the contract or in the circumstances of its breach,'" SmithKline Beecham Corp. v. Abbott Lab'ys., No. 1:15cv360, 2017 WL 1051123, at *13 (M.D.N.C. Mar. 20, 2017)

---

5(...continued)
Defendants' collection of the Termination Fees and/or withholding of sums (see Docket Entry 1 at 17-18), its UDTPA claim pertains to "Termination Fees" and "Amazon [s]hrinkage" (id. at 19 (emphasis omitted)), the latter category of which the "Motion [ ] does not address" (Docket Entry 12 at 7 n.7).  Plaintiff's UDTPA claim "contains separate and independent theories of relief supported by independent factual allegations," Georgion v. Bank of Am., N.A., No. 1:22cv618, 2025 WL 2388779, at *4 (W.D.N.C. Aug. 18, 2025). (See Docket Entry 1, ¶¶ 98-100 (separating allegations as to both categories).)  The Court may thus consider the Motion's request for partial dismissal of that claim. See Georgion, 2025 WL 2388779, at *4-5 (distinguishing and/or declining to follow non-binding, sister-circuit precedent to the contrary).

17

(quoting <u>Bartolomeo v. S.B. Thomas, Inc.</u>, 889 F.2d 530, 535 (4th Cir. 1989)).

Despite Plaintiff's contention that the Complaint alleges "several aggravating circumstances that . . . sufficiently support[] its UDTPA claim" (Docket Entry 16 at 14), further analysis reveals none. For example, the Complaint alleges that Defendants "engaged in unfair trade practices by collecting [the ] Termination Fees from [Plaintiff] while simultaneously entering into a contract with Continental for the identical services and hardware." (Docket Entry 1, ¶ 98d.; <u>accord</u> <u>id.</u> ¶ 98g.; Docket Entry 16 at 17.) Even if the Complaint itself did not contradict that conclusory allegation (<u>see, e.g.</u>, Docket Entry 1, ¶ 98f. (alleging that Defendants contracted with Continental "only after" collecting the Termination Fees); <u>accord</u> <u>id.</u> ¶¶ 27, 42), such conduct lacks the requisite unfairness or capacity to deceive, as Defendants informed Plaintiff of its "'discussions'" with Continental (<u>id.</u> ¶ 37) before Plaintiff paid the Termination Fees. Even without Plaintiff's knowledge, Defendants' alleged "negotiation and formation of a separate contract for [similar services would] . . . relate [only] to the issue of damages," <u>Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc.</u>, 989 F. Supp. 2d 471, 476 (E.D.N.C. 2013), in the (as-yet

18

unrealized) event that Defendants pursued their own claims for breach of contract, <u>see</u> <u>id.</u>[6]

Likewise, by informing Plaintiff of their intent to terminate the Agreement (<u>see</u> Docket Entry 1, ¶ 18), invoicing Plaintiff for a portion of its outstanding balance (<u>see</u> <u>id.</u> ¶ 29), and demanding overnight payment of the full balance ten days later (<u>see</u> <u>id.</u> ¶ 30), Defendants did not "appl[y] undue pressure on [Plaintiff] to pay before [it] could learn of the true facts of the [alleged] contract assumption" (Docket Entry 16 at 18); they simply acted on their termination rights under the Agreement, including with forewarning in the form of invoices. <u>See</u> <u>South Alt. Ltd. P'ship of Tenn., L.P. v. Riese</u>, 284 F.3d 518, 539 n.22 (4th Cir. 2002) (noting "rar[ity of] egregious and aggravating circumstances [ ] attend[ing] the exercise of a contractual right").[7] For related

---

6 Plaintiff contests the applicability of "*Rahamankhan . . .* [to this dispute given its] focus [ ] on nondisclosure . . . rather than on deception, as [alleged] here" (Docket Entry 16 at 20). Notwithstanding that distinction, the case suggests the futility of a UDTPA claim premised on the existence of a separate agreement for similar services and/or products, regardless of a plaintiff's knowledge of such agreement. <u>See</u> <u>Rahamankhan</u>, 989 F. Supp. 2d at 476 (noting that existence of such agreement "does not convert th[e] contract dispute into a tort dispute"). And, as explained further in the analysis that follows above, Defendants' alleged statements and actions regarding its agreement with Continental neither possess the requisite capacity to deceive nor demonstrate unfairness.

7 Similarly, despite the Response's contention that "the licensee-licensor relationship inherently demonstrates a power imbalance" (Docket Entry 16 at 18), "there is no [such] imbalance . . . [on the facts alleged, as] the business relationship[] at
(continued...)

19

reasons, the Complaint's allegation that Defendants "impos[ed] interest charges" (Docket Entry 1, ¶ 98e.; accord id. ¶ 32) fails to sustain its UDTPA claim, as the Complaint does not allege that the Agreement forbids such conduct or anything to further substantiate it, foreclosing the possibility of "systematic overcharging [which, on allegations absent here,] can constitute an unfair practice," Foodbuy, LLC v. Gregory Packaging, Inc., No. 3:16cv809, 2022 WL 3102356, at *4 n.4 (W.D.N.C. Aug. 4, 2022). And the Complaint's lone allegation that Defendants "threaten[ed] to disrupt [Plaintiff's] essential services if payment was not made immediately[]" (Docket Entry 1, ¶ 98e.), without further elaboration (see id.), constitutes "a mere [threat to] breach [the Agreement, which,] even if [breached] intentional[ly], [would] not [constitute] an unfair or deceptive act under [the UDTPA]," Bob Timberlake Collection, Inc. v. Edwards, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006); see also PCS Phosphate Co., Inc. v. Norfolk S. Corp., 520 F. Supp. 2d 705, 718 (E.D.N.C. 2007) (noting that "defendants' threats to abandon [a] rail line [despite its contractual obligations] do not rise to 'substantial aggravating

---

7(...continued)
issue [is] demonstrative of the competitive nature of [the parties' industries] and involve[s parties] of sufficiently similar business sophistication and means," Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC, 845 F.3d 104, 111 (4th Cir. 2016). (See Docket Entry 1, ¶¶ 8-9 (alleging extent of Plaintiff's and Defendants' various business capabilities).)

20

circumstances' surrounding nonperformance of the contract to support a UDTPA claim"), aff'd, 559 F.3d 212 (4th Cir. 2009).

Additionally, Defendants' alleged promise to "'make the necessary adjustments'" (Docket Entry 1, ¶ 28 (emphasis omitted)) in the event that a third-party "'assume[d] the [Agreement]'" (id. (emphasis omitted)) does not constitute a promise to "refund[ the Termination Fees] after securing the Continental contract" (id. ¶ 98l.; accord Docket Entry 16 at 17)) or a "false representation" (Docket Entry 16 at 20) sufficient to sustain Plaintiff's UDTPA claim. At best, Defendants' statement amounts to an offer to adjust "'the offboarding process'" (Docket Entry 1, ¶ 28) in the event of an assumption, which (per the allegations of the Complaint as documented previously) never occurred. Nothing in the Complaint renders that offer "false" (Docket Entry 16 at 17) or exhibits its "capacity or tendency to deceive," Belk, 679 F.3d at 164, regardless of whether Plaintiff misinterpreted Defendants' statement, see Salami v. JPMorgan Chase Bank, N.A., No. 1:18cv794, 2020 WL 3129891, at *7 (M.D.N.C. June 12, 2020) ("'[M]isunderstandings, despite their capacity to deceive, ordinarily are insufficient to sustain a claim of deceptive conduct under the UDTPA.'" (quoting Curtis B. Pearson Music Co. v. Everitt, 368 F. App'x 450, 456 (4th Cir. 2010))), recommendation adopted, 2020 WL 5705924 (M.D.N.C. July 1, 2020). The Complaint therefore

21

fails to allege the existence of aggravating circumstances necessary to support a UDTPA claim as to the Termination Fees.

### C. Further Deficiencies

The Supporting Brief contends that Plaintiff's "[c]laims also fail because North Carolina law does not recognize an affirmative claim against a party for its purported failure to mitigate its own damages" (Docket Entry 12 at 12). The Response counters that Plaintiff "does not assert a cause of action for mitigation of damages" (Docket Entry 16 at 10) and that Defendants' alleged failure to mitigate does "not [provide] the legal basis for its claims" (id.). "Instead, [the Response insists that Plaintiff] asserts [valid] claims for . . . money had and received" (id.), "breach of contract, [and] breach of the covenant of good faith and fair dealing" (id.). The Reply, in turn, contests Plaintiff's position on these points. (See Docket Entry 18 at 2-5, 8-10.)[8]

---

[8] The Reply's arguments as to the shortcomings of each claim (see Docket Entry 18 at 2-5) stand in rebuttal to the Response, which maintains that the claims rest on theories of relief unrelated to Defendants' failure to mitigate damages (see Docket Entry 16 at 10). The Court may thus consider the Reply's arguments without classifying them as improperly raised. See Hutty v. PNC Bank, Civ. No. 21-2535, 2023 WL 2025029, at *3 n.2 (D. Md. Feb. 15, 2023) ("Ordinarily, the [c]ourt does not consider arguments raised for the first time in a reply brief."). In any event, even if raised for the first time, "whether to consider such arguments lies within the [Court's] discretion . . . ." Snowden v. Prince George's Cnty. Dep't of Corr., Civ. No. 18-160, 2018 WL 3862253, at *3 n.2 (D. Md. Aug. 14, 2018).

22

### 1.  Money Had and Received

The Complaint's claim for "[m]oney [h]ad and [r]eceived" (Docket Entry 1 at 17 (emphasis omtitted)), "under the doctrine of unjust enrichment, is an action o[f] implied contract," Dean v. Mattox, 250 N.C. 246, 251, 108 S.E.2d 541, 546 (1959).  As the Reply correctly observes, a "claim for [m]oney [h]ad and [r]eceived cannot be maintained when the parties' relationship is governed by a written contract" (Docket Entry 17 at 5 (citing Atlantic & E. Carolina Ry. Co. v. Wheatly Oil Co., 163 N.C. App. 748, 753, 594 S.E.2d 425, 429 (2004)).  See also Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x 916, 920 (4th Cir. 2003) (noting that, under North Carolina law, "[a]n unjust enrichment claim is available only in the absence of an express contract between the parties").  Because the Complaint alleges the existence of a written agreement (see, e.g., Docket Entry 1, ¶ 13), its claim for money had and received must fail.

### 2.  Breach of Contract

As noted in the Response, "[Plaintiff's] breach of contract claim is based on Defendants' alleged breach of the [ ] Agreement" (Docket Entry 16 at 11) and, to survive dismissal, must rest on factual allegations establishing "'(1) [the] existence of a valid contract and (2) breach of the terms of that contract'" (id. (quoting Cordaro v. Harrington Bank, FSB, 260 N.C. App. 26, 37, 817 S.E. 2d 247, 256 (2018))).  As to that second element, the

23

Complaint alleges that Defendants "breached the [ ] Agreement by charging [Plaintiff] and/or withholding funds from [Plaintiff] under the guise of offboarding or Termination Fees." (Docket Entry 1, ¶ 86.) Similarly, the Response contends that "Defendants breached the [ ] Agreement by improperly treating it as terminated" (Docket Entry 16 at 11). The Reply, however, maintains that Defendants "w[ere] contractually entitled" (Docket Entry 18 at 3) to "charg[e ] and/or withhold[] funds from [Plaintiff]" (id. at 2 (internal quotation marks omitted)). A review of the Complaint and the Agreement confirms Defendants' view.

To begin, the terms of the Agreement provide that, in the event Plaintiff "'sells or agrees to sell all or substantially all of its business or assets to any other party . . . , [Defendants] may in [their] sole discretion terminate th[e] Agreement'" (Docket Entry 1, ¶ 15). Once Plaintiff "informed [Defendants] that [it] intended to sell the majority of its assets to . . . Continental" (id. ¶ 16), Defendants opted to exercise their termination rights (see id. ¶ 18 (alleging that Defendants informed Plaintiff of their intent to terminate the Agreement one day after Plaintiff's notice of its intent to sell)). Further, in "demanding . . . payment" (id. ¶ 30) from Plaintiff, Defendants acted according to the terms of the Agreement, which required that "[a]ny unpaid [f]ees and other monetary obligations owed to [Defendants] . . . become immediately due" upon termination (Docket Entry 12-1, § 9.3(iii)).

24

That same clause also demonstrates that "[Plaintiff ] authorize[d Defendants] to set off any and all unpaid [f]ees or other monetary obligations . . . against amounts of [Plaintiff's] which [Defendants] may [ ] have on hand" (id.), dispelling any notion that Defendants breached the Agreement by "withholding funds from [Plaintiff]" (Docket Entry 1, ¶ 86) and applying those funds as "a credit" to Plaintiff's balance upon invoicing (id. ¶ 30).

Additionally, the Response's insistence that the "Agreement was actually assumed" (Docket Entry 16 at 4) remains (under the allegations of the Complaint) unfounded (see, e.g., Docket Entry 1, ¶ 42 (alleging the existence of separate agreement between Defendants and Continental)) and, as to its breach of contract claim, fails to render the Agreement's terms inoperable. Defendants did not breach those terms by acting on their termination rights pursuant to Plaintiff's sale.

In sum, the Complaint's breach of contract claim attempts to hold Defendants liable for actions expressly authorized under the Agreement. Because the Motion seeks dismissal of that claim for lacking a theory of relief beyond Defendants' failure to mitigate damages (see Docket Entry 11, ¶ 8), and because the Complaint demonstrates none, Plaintiff's breach of contract claim fails as a matter of law, including as to any withheld sums.

25

### 3.  Good Faith and Fair Dealing

The Response further contends that "[t]he Complaint's allegations establish a breach of the implied covenant of good faith and fair dealing" (Docket Entry 16 at 12), while the Reply insists that "Plaintiff [ ] cannot use the implied covenant to create [ ] otherwise non-existent contractual obligation[s]" (Docket Entry 18 at 4).  This claim constitutes "'a separate claim from breach of contract . . ., [provided] the express terms of the contract do not preclude the implied terms which [ P]laintiff claims were breached'" (Docket Entry 16 at 12 (quoting Nanendla v. WakeMed, 24 F.4th 299, 308 (4th Cir. 2022))).  A party breaches its duty of good faith and fair dealing when it fails "to make reasonable efforts to perform [its] obligations under the agreement," Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 40 N.C. App. 743, 746, 253 S.E.2d 625, 627 (1979), or when it "injures the right of [its counterpart] to receive the benefits of the agreement," Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (internal quotation marks omitted).

Here, the Complaint alleges that Defendants "unfairly interfered with [Plaintiff's] right(s) to receive the benefits of the [ ] Agreement by charging [Plaintiff] and/or withholding funds from [Plaintiff] under the guise of offboarding or Termination Fees" (Docket Entry 1, ¶ 92; see also id. ¶ 93 (alleging that Defendants' "treating the conclusion of [their] relationship with

26

[Plaintiff ] as a termination" establishes Defendants' failure to "act in good faith")). Yet, neither the Complaint nor the Response identifies what "benefits" the Agreement impliedly vested in Plaintiff that Defendants then deprived. The plain terms of the Agreement enabled Defendants to collect "[a]ny unpaid [f]ees" (Docket Entry 12-1, § 9.3(iii)) and to offset such amounts with funds otherwise owed to Plaintiff (see id.). Plaintiff cites no legal authority or factual support for the proposition that the Agreement includes an implied obligation to refund the Termination Fees or withheld funds in the event that Defendants reach an agreement with Plaintiff's buyer, or that contracting with Continental would nullify Defendants' termination rights. (See Docket Entry 16 at 11-13.) Accordingly, the Complaint fails to state a claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

North Carolina's voluntary payment doctrine bars Plaintiff's recovery of the Termination Fees, and the Complaint fails to allege substantial aggravating factors to sustain the portion of its UDTPA concerning those fees. Furthermore, for additional reasons, each cause of action relevant to the Motion fails to state a claim for relief as alleged.

**IT IS THEREFORE RECOMMENDED** (A) that the Motion (Docket Entry 11) be granted, (B) that Counts Four, Five, and Six be dismissed

27

pursuant to Rule 12(b)(6) for failure to state a claim, and (C) that Count Seven be partially dismissed as to any claim for recovery of the Termination Fees on that same basis.

This 31st day of July, 2026.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

Case 1:25-cv-01043-WO-LPA    Document 20    Filed 07/31/26    Page 28 of 28